C. S. Day, Transferee, et al. [1] v. Commissioner. Day v. Commissioner
Docket Nos. 626-62, 341-63, 358-63.
United States Tax Court
T.C. Memo 1965-326; 1965 Tax Ct. Memo LEXIS 4; 24 T.C.M. (CCH) 1812; T.C.M. (RIA) 65326; December 29, 1965
C. S. Day, pro se, Rt. #2, Brookhaven, *5 Miss., Ford P. Mitchell, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: The respondent determined deficiencies and additions to Federal income tax as follows: Additions
to Tax
Sec.
293(b),
Docket
Income
I.R.C.
No.
Year
Tax
1939
626-62
1948
$ 3,943.63
$ 1,971.82
341-63
1947
26,456.72
13,228.36
358-63
1948
6,673.40
3,336.70
In Docket No. 626-62 the respondent determined that C. S. Day was a transferee of the assets of the McCall Lumber Company, Inc. (hereinafter sometimes referred to as McCall, Inc.) and, as such, was liable for the deficiency in income tax and addition to the tax due from McCall, Inc., for 1948. The questions presented for our consideration are: (1) Did the taxpayers in Docket Nos. 341-63 and 358-63 substantially understate their taxable income for 1947 and 1948, and if so, in what amounts; (2) was the taxable income of McCall, Inc., substantially understated for 1948; (3) was any part of the deficiency in income tax due from the petitioners for 1947 and 1948 and McCall, Inc., for 1948 due in whole or in part to fraud with intent to evade *6 the payment of Federal income taxes; (4) is the petitioner, C. S. Day (hereinafter sometimes referred to as petitioner) liable as a transferee of the assets of McCall, Inc., for any deficiency in income tax and addition to tax which may be determined to be due from McCall, Inc., for 1948; (5) are the assessment and collection of any deficiencies which may be determined to be due from McCall, Inc., for 1948 barred by the statute of limitations? Some of the facts were stipulated during a hearing pursuant to our Order to Show Cause under Rule 31(b)(5). These facts together with oral stipulations made during the trial are incorporated herein by this reference. Petitioners C. S. Day and Pearl Day are husband and wife. They lived in Brookhaven, Mississippi, during the years in issue. The petitioner filed an individual Federal income tax return for 1947 with the collector of internal revenue for the district of Mississippi. In this individual return the petitioner reported adjusted gross income of $14,937.30. He elected to use the standard deduction of $500, making his net income, as disclosed by the return, $14,437.30. In a statutory notice of deficiency dated October 22, 1962, the *7 respondent increased the petitioner's income by $45,400.73 and disallowed the claimed standard deduction of $500. As corrected by the respondent, the petitioner's adjusted gross income for 1947 is $60,338.03. The respondent allowed the petitioner itemized deductions totaling $612.24. The petitioner's net income for 1947, as adjusted by the respondent, amounts to $59,725.79. The petitioners C. S. Day and Pearl Day filed their joint Federal income tax return for 1948 with the collector of internal revenue for the district of Mississippi. In this return the petitioners reported adjusted gross income of $9,619.14 and claimed standard deductions of $961.91. Their taxable net income, as disclosed by the return was $8,657.23. In a statutory notice of deficiency also dated October 22, 1962, the respondent increased their income by $22,768.71 and disallowed the claimed standard deduction. The petitioners' adjusted gross income for 1948, as corrected by the respondent, is $32,387.85. The respondent then allowed them itemized deductions totaling $1,221.84, leaving the petitioners with an adjusted net income of $31,166.01. McCall Lumber Company, Inc., of Brookhaven, Mississippi, filed its *8 corporate income tax return for 1948 with the collector of internal revenue for the district of Mississippi. On this return the corporation reported net income of $2,906.27. In a statutory notice of deficiency dated November 29, 1961, the respondent increased the income of McCall, Inc., by $17,309.51. The Company's net income for 1948 as corrected by the respondent is $20,215.78. During the years 1946 and 1947 the petitioner operated a lumber business as a sole proprietorship under the name of McCall Lumber Company (hereinafter referred to as McCall). During 1947 the petitioner received income from McCall as well as from rental property, royalty interests, farm operations, and sales of personal and real property. In 1948, in addition to income from these sources, the petitioner also received a salary and dividend income from McCall, Inc. On September 6, 1947, the petitioner incorporated his lumber business under the name of McCall Lumber Company, Inc. The corporation did not begin operations until January 1, 1948, at which time the petitioner transferred all of the assets and liabilities of his sole proprietorship to McCall, Inc. On January 2, 1952, McCall, Inc., transferred without *9 consideration all of its assets and liabilities back to the petitioner who continued to operate the same lumber business thereafter as a sole proprietorship. The charter of the corporation was suspended on August 12, 1954, for nonpayment of franchise taxes. The investigations herein began in 1951. In September of that year Special Agent Eugene Brown (hereinafter referred to as Brown) met with the petitioner at the Inez Hotel in Brookhaven, Mississippi. Brown asked the petitioner for permission to examine his books and records for the years 1946 through 1948, inclusive, and the books and records of McCall, Inc., for 1948. The petitioner told Brown that the records in question had been burned earlier that summer, when the Masonic Temple, the building housing the records, was destroyed by fire. In order to verify the petitioner's story an unidentified investigating agent questioned the petitioner's bookkeeper, S. L. Whittington, who was called as a witness by respondent and testified at the trial. During this first interview with Whittington the petitioner and another employee of McCall, Inc., were present. Whittington corroborated the petitioner's story that the books and records *10 for the years in question had been destroyed when the Masonic Temple burned. Sometime after the first interview, the investigating agent again questioned Whittington about the petitioner's records. At this meeting Whittington told him that he had lied to him earlier at the express direction of the petitioner. Whittington did not tell the truth at the first interview because the petitioner was present, and he was afraid of losing his job. In fact the books had not been in the Masonic Temple when it was destroyed by fire as petitioner and Whittington well knew, because at the petitioner's request Whittington had moved the books from the office of McCall, Inc., to the petitioner's home. After this second interview with Whittington, the investigating agent went to the petitioner's home and found most of his records for 1948 and practically all of the records of McCall, Inc., for 1948. The records which were found included most of the petitioner's personal checks for the year 1948, as well as most of the checks for 1948 drawn on an account entitled "McCall Lumber Company" or "McCall Lumber Company, Inc." There was also a cash disbursements and cash receipts journal for McCall, Inc. *11 , for 1948, along with miscellaneous invoices which were generally incomplete. These invoices contained sales and expense items for 1948. None of the records for 1947 was found at the petitioner's home. Internal Revenue Agent Maury Thames (hereinafter referred to as Thames) found some of the petitioner's records for 1947 at an abandoned sawmill. Thames found invoices for that year which show total sales of $489,792.27. The petitioner's return for 1947 reports sales of $382,870.20. The petitioner maintained no books and records for 1947, and Thames found canceled checks for only two months of that year. Many of the items the petitioner's net worth schedule, set out later in these findings, were stipulated to by the parties. Other assets and liabilities proved during the trial are discussed hereinafter. In 1947 Fred Jones (hereinafter referred to as Jones) purchased land from the petitioner for $8,000. He paid the petitioner $1,000 in cash at the time of the sale with the balance to be paid by delivery of lumber to the petitioner. During 1947 Jones delivered lumber valued at $4,711.69 to the petitioner leaving a balance due on December 31, 1947 of $2,288.31. On October 5, 1948, a *12 deed of trust was recorded to secure an indebtedness from Jones to the petitioner in the amount of $3,055.91. There is no explanation why the deed of trust was for an amount greater than the debt of $2,288.31 which existed at the close of 1947. No payments were made on this indebtedness during 1948. On December 31, 1948, Jones owed the petitioner $3,055.91. In 1948 the petitioner loaned his brother, Emerson Day, (hereinafter sometimes referred to as Emerson) $2,500 for the purpose of purchasing the Leggett Sash & Door Works. Instead of waiting for Emerson to repay him the $2,500, the petitioner, along with Emerson and another brother, E. A. Day, went to the Bank of Franklin, Meadville, Mississippi, (hereinafter referred to as Bank of Franklin) and borrowed $2,500. This amount was given to the petitioner in payment for the $2,500 he had previously loaned to Emerson. The bank did not charge the loan to the three brothers jointly. It charged the loan directly to the petitioner's individual account. Approximately 20 months later Emerson personally repaid the $2,500 to the bank. This transaction is treated as both an account receivable due from Emerson and as a note payable to the Bank *13 of Franklin in the petitioner's net worth schedule. The petitioner purchased 270 acres of land from E. A. Day in 1946 for $7,000. At the time of the sale there were approximately 150,000 board feet of merchantable timber standing on the land. During this period timber was selling for $13.764 per thousand board feet. The value of the timber standing on the land at the end of 1946 was $2,064.60. The balance of the $7,000 is treated as real estate in the petitioner's net worth schedule. This timber was cut during 1947, and the record does not indicate what became of it. In 1945 the petitioner purchased standing timber from Jones for $1,450. None of this timber was cut until sometime in 1948. After the petitioner had cut a part of the timber, Jones repurchased the remaining standing timber in 1948 for $500. In his net worth schedule the petitioner is treated as owning standing timber with a cost basis of $1,450 at the close of the years 1946 and 1947. On December 31 of each of the years 1947 and 1948 the petitioner owned Tennessee walking horses which cost him a total of $4,532.50. Petitioner bought all of these horses during 1947. On May 30 of 1947 the petitioner paid Lavelle Brown *14 $600 for a black mare named Queen and a colt named Lulu Wilson. On June 24, 1947, the petitioner issued a check to Charles S. Chenerman for $2,500 in payment for a horse named Little Mary Boy. On July 29, 1947, the petitioner wrote a check to Si Parkman for $82.50 in payment for a horse named Queen Elizabeth. On September 6, 1947, the petitioner paid J. B. Wood $1,000 for a black mare and a colt. On the same day the petitioner wrote a check to S. W. Bush, Jr., for $350 in payment for a colt. All of the checks in the above transactions bore a notation that they were in payment for horses. On August 19, 1948, the petitioner bought a Cadillac from Brookhaven Motor Sales. The cash price of the automobile plus the finance charges bring the total price to $4,190. Later in 1948, on October 29, the petitioner bought another Cadillac from Brookhaven Motor Sales. The cash price plus the finance charges of this automobile totaled $4,092.94. On December 31, 1948, the petitioner owned automobiles for his personal use which cost him $8,282.94. This is treated as an asset in the petitioner's net worth schedule. At the end of 1948 the petitioner owed General Motors Acceptance Corporation $4,258.68 *15 on these automobiles. This liability is accordingly reflected in the petitioner's net worth schedule. At the end of the years 1946 and 1947 the petitioner owned business equipment for use in his sole proprietorship, McCall. The cost basis of this property has been stipulated for the purposes of this case. On January 1, 1948, the petitioner transferred all of this equipment except for a farm tractor to McCall, Inc. During 1948 the petitioner issued seven separate checks to Hal Scott, totaling $2,000, in payment for the Hal Scott Mill. The petitioner also wrote a check to W. C. Crum for $257 in partial payment for the mill. On December 31, 1948, the petitioner individually owned business equipment having a cost to him of $3,885.49. The petitioner owned a considerable amount of real estate during the years in question. The cost to him of much of this land and the fact of his ownership have been established as facts under Rule 31(b)(5) of our Rules of Practice. The petitioner's ownership of other real estate was proved at the trial. Unless otherwise indicated the petitioner owned this land continuously from the time of purchase through December 31, 1948. The petitioner and J. A. *16 Naul purchased Lot 1 of the Wildwood Subdivision of Brookhaven, Mississippi, from I. A. Foggo on December 17, 1947, for $6,500. The petitioner owned a one-half interest in this property. The petitioner purchased 270 acres of land from his brother, E. A. Day, and his wife on June 14, 1946, for $4,935.40. This purchase of land was the same transaction discussed in the finding involving the value of standing timber purchased from E. A. Day. The cost of the timber was $2,064.60, and the cost of the land was $4,935.40. The petitioner purchased land from J. L. Fuller on May 8, 1944, for $3,400. This property was sold to Jones on September 15, 1948. When the petitioner bought the land from Fuller, he paid $600 in cash and assumed on indebtedness of Fuller's to one C. S. Cochran. The amount of this indebtedness was $2,800. During 1947 and 1948 petitioner's brother, Wilbur A. Day, (hereinafter sometimes referred to as Wilbur) was living in Baton Rouge, Louisiana. During 1947 Wilbur built a house at 1417 Richland Avenue in Baton Rouge which petitioner helped him to finance. During 1947 the petitioner made loans to Wilbur totaling $9,473.16 for such purpose. Wilbur had a construction loan *17 on the house with the City National Bank of Baton Rouge in the amount of $22,000, which was later raised to $29,000. The petitioner made payments on this loan totaling $6,814.80 during 1947 and 1948. During 1948 the petitioner also advanced Wilbur $200 for shrubbery, thus the petitioner advanced a total of $16,487.96 during 1947 and 1948, to help Wilbur build the house. In addition to the above out-of-pocket advances, the petitioner borrowed $16,000 in his own name from the Louisiana Fire Insurance Company in 1948 for the purpose of paying off his brother's construction loan at the City National Bank in Baton Rouge. The petitioner's total investment of his own money in the house in question was $32,487.96. In addition to his investment in the house the petitioner paid $479.55 to the lawyer who closed the construction loan with the City National Bank of Baton Rouge. On October 3, 1948, Wilbur sold the house to the petitioner for a stated consideration of $32,500. In the petitioner's net worth statement for 1948, under the entry "Real Estate & Improvements," he is correctly treated as owning such house and lot with a cost to him of $32,967.51, and the remaining balance of the loan *18 from the Louisiana Fire Insurance Company ($15,917.29) is correctly shown as a liability. On September 22, 1947, the petitioner and J. A. Naul purchased a 1/64th royalty interest in mineral property from one Swep Lovett for $3,250. Since the property was purchased jointly, the petitioner's interest in these royalty rights was $1,625. The petitioner still owned this royalty interest on December 31, 1948. On January 31, 1947, the petitioner purchased a 15/30ths interest in other mineral rights from one Zollie Watts for $1,500. The petitioner sold two-thirds of his interest in these rights later in 1947. On December 31 of 1947 and 1948 the petitioner owned an interest in mineral rights with a cost basis to him of $500. During 1946 and a part of 1947 the Homochitto Lumber Company (hereinafter referred to as Homochitto) was owned by Earl Grann, Opie Grann, and James Thompson. Each of these individuals owned one-third of the outstanding stock. In 1947 Earl Grann and Opie Grann sold their stock in Homochitto to the petitioner for $10,000. Two stock certificates, found in the petitioner's records, indicated that the petitioner owned 116 shares of stock in Homochitto. Another stock *19 certificate also found in the petitioner's records indicated that another 58 shares in Homochitto were owned by J. A. Thompson. At the end of the years 1947 and 1948 the petitioner owned capital stock in Homochitto with a cost basis of $10,000. On December 31, 1947, the petitioner owned capital stock in McCall, Inc., with a cost basis of $110. This figure represents the amount of the incorporation fee. The company was incorporated on September 6, 1947, but the assets and liabilities of McCall were not transferred to it until January 1, 1948. The assets transferred to McCall, Inc., at the beginning of 1948 had a cost basis of $67,724.24. The reserve for depreciation and the notes payable transferred to the corporation on the same date had a basis of $27,153.83. On January 1, 1948, the petitioner's net basis in the assets and liabilities transferred to McCall, Inc., was $40,570.41. During 1948 the petitioner made withdrawals from McCall, Inc., totaling $40,432.45, but during the same period he reinvested funds in McCall, Inc., totaling $17,547.33. The petitioner's net withdrawals from McCall, Inc., for 1948 were $22,885.12. A part of the net withdrawals was a constructive dividend *20 to the petitioner and the balance was a capital distribution from McCall, Inc. The following schedule makes the computation: Net withdrawals Made by C. S.
Day
$22,885.12
Amount Treated as Dividends: Current Earnings
$20,215.78
Less Federal Income
Taxes Accrued
4,553.95
15,661.83
Amount Treated as Capital Distri-
butions
$ 7,223.29
The petitioner's net basis in the assets and liabilities transferred to McCall, Inc., on January 1, 1948, was $40,570.41. This figure is reduced by $7,223.29, the amount of the capital distribution to the petitioner during 1948, leaving him with an increase of $33,347.12 in his investment in McCall, Inc., for 1948. On December 31, 1947, the petitioner's investment in McCall, Inc., was $110. This amount is added to the increase in his investment during 1948, making the petitioner's total investment in McCall, Inc., $33,457.12 on December 31, 1948. This is the figure which correctly appears in the petitioner's net worth schedule. All of the loans both secured and unsecured which the petitioner or McCall, Inc., had outstanding during the years 1946 to 1948, inclusive, are accounted for in the petitioner's net worth statement. *21 Although the petitioner individually had loans outstanding with the Bank of Franklin during the years 1947 and 1948, neither McCall nor McCall, Inc., borrowed money from that bank during the years 1946 to 1948, inclusive. Lawrence Warehouse Company (hereinafter referred to as Lawrence Warehouse) is in the field warehousing business. Its business involves storing goods in warehouses and issuing warehouse receipts for these goods which are in turn pledged as collateral for loans. Lawrence Warehouse is not in the business of making loans. It did not lend money to either the petitioner, McCall, or McCall, Inc., during any of the years 1946 to 1948, inclusive. At an undetermined time Lawrence Warehouse issued warehouse receipts to either the petitioner or McCall, Inc., which were pledged to the State Bank and Trust Company (hereinafter referred to as State Bank and Trust), Brookhaven, Mississippi, as collateral for loans. The amount of the loans secured by these warehouse receipts is accounted for in the net worth statement. The records of State Bank and Trust for 1948 were accidentally destroyed. It is impossible to know the exact amount of any unsecured loan with that bank the petitioner *22 or McCall, Inc., might have had in 1948. Because of bank policy neither the petitioner nor McCall, Inc., could have had an unsecured loan in excess of $15,000. The petitioners did not have any undeposited cash on hand from December 31, 1946, through December 31, 1948. The following is a net worth schedule for the petitioner, setting forth a complete statement of his assets and liabilities as of December 31, 1946, December 31, 1947, and December 31, 1948, as they have been stipulated, established by our Rule 31(b)(5) procedure and proved at the trial: NET WORTH SCHEDULE
1946
1947
1948
ASSETS
Checking Accounts
Bank of Franklin: C. S. Day
$ 259.07
$ 1,735.05
$ 613.28
State Bank and Trust Co.: C. S. Day
1,183.66
206.03
419.79
Mrs. C. S. Day
4,033.86
309.36
115.92
McCall Lumber Co.
1,250.40
914.41
0
C. S. Day, Building Account
0
76.00
(68.64)
United States Savings Bonds
1,500.00
1,500.00
0
Lumber Inventory
15,000.00
14,770.20
0
Accounts Receivable: Trade Accounts
$ 12,456.00
$ 16,318.00 $0
L. P. Jordan
7,675.00
0
0
Fred Jones
0
2,288.31
3,055.91
Wilbur A. Day
0
9,473.16
0
Emerson Day
0
0
2,500.00
Clemmie & Thelma Smith
0
0
300.00
Roy Brashier
0
7,005.00
0
Louisiana Fire Insurance Co $.h0
0
46.74
Standing Timber, E. A. Day
2,064.60
0
0
Standing Timber, Fred Jones
1,450.00
1,450.00
0
Diamond Ring
0
1,000.00
1,000.00
Tennessee Walking Horses
0
4,532.50
4,532.50
Automobiles, Personal
1,250.00
3,380.71
8,282.94
Business Equipment
18,906.80
29,856.81
3,885.49
Automobiles, Business
2,100.00
2,779.88
3,931.40
Real Estate & Improvements
32,528.40
47,688.40
85,955.91
Royalty & Mineral Rights
0
2,125.00
2,125.00
Capital Stock - Homochitto Lumber Co., Inc.
0
10,000.00
10,000.00
Capital Stock - McCall Lumber Co., Inc.
0
110.00
33,457.12
Total Assets
$101,657.79
$157,518.82
$160,153.36
RESERVES AND LIABILITIES
Reserve for Depreciation
$ 7,420.68
$ 11,261.57
$ 3,443.54
Notes Payable: State Bank & Trust Co., Secured
12,456.00
16,318.00
0
State Bank & Trust Co., Unsecured
6,373.78
10,000.00
9,500.00
Bank of Franklin
0
7,542.38
6,750.00
A. J. Mathieu
10,000.00
0
0
E. A. Day
5,575.00
0
0
Frank Hartman
5,000.00
7,400.00
6,200.00
Brookhaven Production Credit Association
0
1,900.00
1,900.00
Brookhaven Equipment Co.
0
2,420.00
0
J. D. Shurden
1,120.00
0
0
Louisiana Fire Insurance Co.
0
0
15,917.29
General Motors Acceptance Corp.
0
0
4,258.68
Commercial Securities
0
0
1,389.15
Total Reserves and Liabilities
$ 47,945.46
$ 56,841.95
$ 49,358.66
Net Worth
$ 53,712.33
$100,676.87
$110,794.70
Deduct: Net Worth End of Prior Year
53,712.33
100,676.87
Increase in Net Worth
$ 46,964.54
$ 10,117.83
*23 At the hearing on our Order to Show Cause under Rule 31(b)(5) respondent was contending that petitioner's personal living expenses for 1947 and 1948 were respectively $15,338.52 and $19,570.08. Petitioner contested these amounts but offered to and did stipulate that such expenses were at least $10,153.89 and $12,877.56 on respondent's assumption of the burden of proving any additional such expenses at the trial herein. Petitioner's personal living expenses for the years in issue were $10,153.89 and $12,877.56, respectively. During the years in issue the petitioner also sustained losses on the sales of personal automobiles. In 1947 the loss was $298.25 and in 1948, $318. The following schedule makes the final adjustments necessary to determine the amount of the understatement of taxable income for 1947 and 1948: 1947
1948
Increase in Net Worth (from schedule)
$46,964.54
$10,117.83
Add: Personal living expenses
10,153.89
12,877.56
Federal income taxes paid during year
5,704.72
7,905.20
Unallowable losses
298.25
318.00
Total income
$63,121.40
$31,218.59
Deduct: Nontaxable income and allowable deductions: 50% of long-term capital gains
[5,262.50)
[1,242.71)
Statutory depletion
(2,705.50)
(4,280.55)
Adjusted gross income as corrected
$55,153.40
$25,695.33
Adjusted gross income reported on return
14,937.30
9,619.14
Understatement
$40,216.10
$16,076.19
*24 The petitioner's individual return for 1947 and the petitioners' joint return for 1948 were prepared by Mary Byrne, nee Herrin. Petitioner gave her none of his books or records for this purpose, but supplied her with lists and schedules he had, or had had prepared. On July 19, 1960, in the United States, District Court for the Southern District of Mississippi the petitioner was sentenced to pay a fine of $500 for the fraudulent evasion of Federal income taxes for 1947. The petitioner pleaded nolo contendere. Many of the books and records of McCall, Inc., for the year 1948 were found at the petitioner's home. These books included miscellaneous invoices and a cash disbursements and cash receipts journal. When the entries in the disbursements and receipts journal were compared with the balance sheet on McCall, Inc.'s income tax return for 1948, there was an unexplained difference of $96,860.96. The books and records of McCall, Inc., for 1948 were inadequate to determine the company's income. The respondent computed the company's net income for 1948 by the net worth and nondeductible expenditures method. All of the items in the net worth schedule of McCall, Inc., which follows *25 below, were stipulated to by the parties, established by the Rule 31(b)(5) proceedings, or were proved at the trial. During 1948 Homochitto, a company owned by the petitioner, needed money for general corporate purposes. During that year McCall, Inc., advanced Homochitto $17,509.19. On December 31, 1948, Homochitto owed McCall, Inc., $17,509.19. On December 31, 1947, Roy Brashier and Jones owed money to the petitioner. Neither individual repaid the petitioner individually. Both men repaid their debt by delivering lumber to McCall, Inc. Since these loans were repaid to McCall, Inc., they are included in the company's net worth statement as of January 1, 1948. In 1945, in a transaction described earlier in these findings, Jones sold standing timber to the petitioner for $1,450. At an undetermined time in 1948 part of this timber was cut and used by the petitioner. After a part of this timber was cut, Jones repurchased the rest of the standing timber for $500. Since timber worth $950 was cut by the petitioner and used in the business of McCall, Inc., during 1948, McCall, Inc., is treated in its net worth statement as owning standing timber worth $950 on January 1, 1948. At the *26 beginning and end of 1948, McCall, Inc., had assets and liabilities as follows: NET WORTH SCHEDULE OF McCALL LUMBER CO., INC.
YEAR 1948
Assets
As of 1/1/48
As of 12/31/48
Cash, State Bank & Trust Co., Brookhaven, Mis-
sissippi
$ 914.41
($ 2,717.03)
Accounts Receivable - Trade
16,318.00
15,757.89
Accounts Receivable - Advances, Homochitto Lum-
ber Company
0
17,509.91
Accounts Receivable - Roy Brashier
7,005.00
0
Accounts Receivable - F. L. Jones
2,288.31
0
Lumber Inventory
14,770.20
32,391.57
Machinery and Equipment
25,478.32
43,693.66
Mules
0
250.00
Standing Timber
950.00
0
Incorporation Cost
110.00
110.00
Total Assets
$67,834.24
$106,996.00
Liabilities, Reserve & Capital Stock
Notes Payable
State Bank & Trust Co., Brookhaven, Miss. -
Secured
$16,318.00
$ 15,757.89
State Bank & Trust Co. - Unsecured
0
30,714.11
Yellow Mfg. Acceptance Corp.
0
505.36
Woodward Wight & Co.
0
1,497.54
Commercial Securities
0
783.90
Brookhaven Equipment Co.
2,420.00
1,015.80
E. A. Day
0
4,000.00
Accrued Wages
0
485.00
Accrued Taxes, Miscellaneous
0
1,525.17
Federal Income Tax Payable
0
4,553.95
Reserve for Depreciation
8,415.83
12,700.16
Total Liabilities
$27,153.83
$ 73,538.88
Net Worth
$40,680.41
$ 33,457.12
Less: Net Worth as of 1/1/48
($ 40,680.41)
Decrease in Net Worth
($ 7,223.29)
Add: Federal Income Taxes (offset of liability
figure)
$ 4,553.95
Withdrawals of C. S. Day
22,885.12
27,439.07
Net Income as Corrected
$ 20,215.78
*27 Petitioners' entire defense in these consolidated cases can be best summarized by the following statements from their brief: "I [2] owe no additional taxes for the years 1947 and 1948 on an overall basis as I lost money, regardless of all the facts, figures and stipulations you show, which do not figure income tax as I have stated before." and "* * * if you would understand the operations of McCall Lumber Company and C. S. Day, you could see the facts as true. You state the figures are so in your NET worth schedule, but [they are] not * * * NET worth or taxable income. It is only borrowed money." The primary position, as thus stated, is an objection to the use of the net worth method of reconstructing taxable income. While we share taxpayer's lack of enthusiasm for such method, and agree that it should be employed only with caution and exactness, yet there are cases where this resort to circumstantial evidence is both proper and necessary; where the Commissioner would in fact be derelict in his duty of protecting the revenues in not emploing it. Holland v. United States, 348 U.S. 121 (1954) *28 and cases there cited. Bryan v. Commissioner, 209 F. 2d 822 (C.A. 5, 1954). We consider this to be such a case. Petitioners' books and records were not introduced, but there was evidence that these records were either incomplete or highly inaccurate. The books and records of McCall, Inc., for 1948 were inadequate to show the company's correct taxable income. Brown examined the relevant books. During his investigation he found a cash receipts and disbursements journal for 1948 along with miscellaneous sales invoices which seemed to be incomplete. Brown took the disbursement and receipts journal along with the balance sheet shown on McCall, Inc.'s return for 1948, and tried to reconcile the disbursements and receipts journal with the income tax return in order to get a working trial balance, but found the substantial difference of almost $100,000 between the trial balance he worked out and the one appearing on the income tax return. Brown testified, and we have concluded, that it would be impossible to determine the company's income for 1948 by use of its books or records. In these circumstances the use of the net worth method is justified. For 1947 the petitioner *29 maintained almost no books or records. Agent Thames found canceled checks for only two months of the year. Sales invoices of McCall for the year showed total sales of $489,792.27, yet petitioner's return for such year reports sales of $382,870.20. For 1948 the investigating agent found most of the petitioner's personal checks and some records, but these records were not complete enough to determine with any accuracy the petitioner's income. Petitioner himself may have been of this same opinion when the questioned returns were prepared, for Mary Byrne, nee Herrin, was given only lists of income and expenses to use in preparing petitioner's returns, and we note that the return of McCall, Inc., exhibits the disclaim "This return was made from figures furnished by taxpayer without audit." We conclude that the circumstances of the instant case fully justified, and even require the use of the net worth method. Schedules showing petitioner's net worth at years endings for 1946, 1947, and 1948, and showing McCall, Inc.'s net worth at the beginning and at the end of 1948 are included in our findings. We have concluded, as is shown fully by our findings, that each item on these net worth *30 schedules has been established by stipulation, by the proceedings had under our Rule 31(b)(5) or by clear and convincing proof produced by respondent at the trial. With very few exceptions the petitioners have not questioned the accuracy of any of the entries on these net worth schedules but have simply stated and argued broadly that they do not "show income" and that the demonstrated increases in net worth do not take into account all of the money that had been borrowed during the respective years. Petitioners, however, have introduced no real evidence of any additional borrowings. Their efforts in this direction amount only to speculation on the part of C. S. Day that more money must have been borrowed than has been shown. As we have noted in our findings of fact the petitioner stipulated personal living expenses for 1947 and 1948 of $10,153.89 and $12,877.56, respectively, upon respondent's assumption of the burden of proving any additional such expenses at the trial. In our opinion respondent did not satisfy such burden and consequently the net worth schedule as found by us reflects such lowered figures for these years. With these exceptions we conclude and hold that petitioners *31 understated taxable incomes for 1947 [1946], 1948 [1947], and 1948 in these three docket numbers in the amounts determined by the respondent. The next question is whether the respondent correctly determined that at least a part of the deficiencies found to be due were due to fraud with intent to evade the payment of Federal income taxes. When any part of a tax deficiency is attributable to fraud with intent to evade tax, the Commissioner has the authority and the duty under section 293(b) of the Internal Revenue Code of 1939 to determine the civil fraud penalty. In determining the correctness of fraud penalties, there is no presumption of correctness attached to the respondent's determinations. The Commissioner has the burden of proving fraud by clear and convincing evidence. Carter v. Campbell, 264 F. 2d 930 (C.A. 5, 1959); Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960). To establish specific fraudulent intent to avoid the payment of income taxes, the proof must depend in part upon circumstantial evidence. Frank Imburgia, 22 T.C. 1002 (1954). The circumstances of the instant case offer clear and convincing proof that the taxpayers *32 filed false and fraudulent returns for all the years in issue. This conclusion is based on the entire record and the conclusions to be drawn from it. As to both years before the Court, respondent has proved by clear and convincing evidence that there were large amounts of unreported income with no plausible explanation. In addition, there are several familiar "badges." The petitioner lied to investigating agents and even directed an employee to lie. During the trial the petitioner made positive statements about loans which were subsequently proved to be nonexistent. The preparers of the returns in issue were required to work from lists furnished by taxpayer rather than from books, and were not authorized to make any audit. We think the record compels the conclusion that the returns for the years in issue were false and fraudulent. Cf. Koscove v. Commissioner, 225 F. 2d 85 (C.A. 10, 1955), affirming a Memorandum Opinion of this Court. The next issue is whether the respondent was correct in determining that the petitioner, as a transferee of the assets of McCall, Inc., is liable for the deficiencies in income tax and addition to tax together with interest which are *33 due from McCall, Inc., for 1948. On January 1, 1948, the petitioner transferred the assets and liabilities of his sole proprietorship, McCall, to McCall, Inc. The corporation operated this lumber business from that time until January 2, 1952, when all of its assets and liabilities were transferred back to the petitioner without consideration. The petitioner continued to operate the business as a sole proprietorship. On August 12, 1954, McCall, Inc.'s corporate charter was suspended by the State of Mississippi for failure to pay franchise taxes. The company did not have the funds to pay the taxes because all of its assets had been transferred to the petitioner for no consideration. When McCall, Inc., transferred its assets and liabilities to the petitioner, the company had assets of $105,770.56 and liabilities of only $68,827.42. As a result of the transfer the petitioner received net assets over liabilities in excess of $36,000. The respondent has not attempted to collect the deficiency from McCall, Inc. Since that company did not have any assets after January 2, 1952, any attempt by the respondent to recover the taxes from McCall, Inc., would have been futile. Section 311(a) *34 of the Internal Revenue Code of 1939 makes no requirement that the respondent perform such an idle formality as a prerequisite to proceeding directly against the transferee. In fact such a contention has been specifically rejected by this Court. Coca-Cola Bottling Co. of Tucson, 37 T.C. 1006, 1013 (1962), affirmed 334 F. 2d 875 (C.A. 9, 1964). Section 311 of the Code, under which the transferee liability was imposed upon petitioner, does not create or define a substantive liability. The section merely provides a procedure whereby the respondent may collect from the transferee the unpaid taxes of the transferor for which, under state law, the transferee is liable. Commissioner v. Stern, 357 U.S. 39, 42 45 (1958). Since the transfer here in question took place in Mississippi the law of that state determines whether the petitioner is liable for the taxes in question as the transferee of McCall, Inc. The pertinent law of Mississippi is stated as follows in Franks v. Receiver of Booneville Banking Co., 202 Miss. 858, 32 So. 2d 859, 862: the rule is that after the dissolution of a corporation, its property passes to its stockholders *35 subject to the payment of the corporate debts. In stating that to be the general rule in Mississippi, the court was interpreting Mississippi law, Miss. Code Ann. § 5354 (1942), which provides, in pertinent part: Debts due to and from the corporation shall not be extinguished by its dissolution, but shall be a charge upon its property. We decide this issue for the respondent. The final question is whether the assessment and collection of the deficiencies due from McCall, Inc., are barred by the statute of limitations. The respondent has carried his burden of convincing us that at least a part of the deficiency due from McCall, Inc., for 1948 was due to fraud with intent to evade Federal income taxes. Under section 276(a) of the 1939 Code a false and fraudulent income tax return tolls the statute of limitations for the assessment and collection of the tax due. Section 311(b) provides that the period of limitations for the assessment of transferee liability shall not expire until one year after the expiration of the period of limitations for assessment against the transferor. Since the period of limitations for the assessment against McCall, Inc., has not expired, the assessment *36 of the liability against the petitioner is likewise not barred by any statute of limitations. Decision will be entered for the respondent in docket No. 626-62 and under Rule 50 in docket Nos. 341-63 and 358-63. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: C. S. Day, Docket No. 341-63, and C. S. Day and Pearl Day, Docket No. 358-63.↩
2. In all the proceedings herein, C. S. Day has treated himself as the alter ego of McCall and McCall, Inc.↩